UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



**FILED**

FEB 09 2010

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

    v.

JOHN LEON NOSTER,

          Defendant - Appellant.

No. 07-50391

D.C. No. CR-04-00621-SVW
U.S. District Court for Central
California, Los Angeles

**MANDATE**



RECEIVED
CLERK, U.S. DISTRICT COURT

FEB -9 2010

CENTRAL DISTRICT OF CALIFORNIA
BY             DEPUTY

The judgment of this Court, entered July 15, 2009, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

                            FOR THE COURT:

                            Molly C. Dwyer
                            Clerk of Court

                            Lee-Ann Collins
                            Deputy Clerk

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*
  v.

JOHN LEON NOSTER,
  *Defendant-Appellant.*

No. 07-50391

D.C. No.
CR-04-00621-SVW

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued October 23, 2008,
Submitted July 15, 2009
Pasadena, California

Filed July 15, 2009

Before: Consuelo M. Callahan and Sandra S. Ikuta,
Circuit Judges, and Milton I. Shadur,* District Judge.

Opinion by Judge Callahan;
Dissent by Judge Shadur

---

*The Honorable Milton I. Shadur, Senior United States District Judge
for the Northern District of Illinois, sitting by designation.

---

**COUNSEL**

Sean K. Kennedy, Federal Public Defender, and Davina T. Chen, Assistant Federal Public Defender, for the defendant-appellant.

Thomas P. O'Brien, United States Attorney for the Central District of California, and Craig H. Missakian, Assistant United States Attorney, for the plaintiff-appellee.

---

**OPINION**

CALLAHAN, Circuit Judge:

John Leon Noster ("Noster") pled guilty to two counts of possessing unregistered firearms in violation of 26 U.S.C.

§ 5861(d) and was sentenced to sixty-one months' imprisonment. He appeals the district court's denial of his motion to suppress evidence obtained from a truck and its attached camper, both of which Noster obtained through fraudulent loan applications and failed to make payments on for over a year. He also appeals the district court's imposition of a four-level enhancement pursuant to United States Sentencing Guidelines ("Guidelines") § 2K2.1(b)(5) (2003) (subsequently renumbered and referred to herein as § 2K2.1(b)(6)). We affirm both the district court's denial of Noster's motion to suppress and his sentence.

I.

## A. The Investigation

In October 2002, Pasadena Police Department Detective Dennis Beene ("Beene") was assigned to investigate Noster's theft of several off-road vehicles from various dealerships. Beene and his partner, Detective Gabriel Marquez ("Marquez"), were on the Taskforce for Regional Autotheft Prevention ("TRAP"), and learned that the Glendale police were also investigating Noster in connection with the theft of two all-terrain vehicles ("ATVs")[1] from Honda of Glendale. Beene also learned that there was an outstanding warrant for Noster's arrest, which issued after two dealerships reported Noster's theft of ATVs in October and November of 2001. In each instance, Noster had purchased ATVs by writing checks and subsequently withdrawing the money from his bank account, causing the checks to bounce.

Around the same time that Noster stole the ATVs, he stopped making payments on a GMC Sierra truck and a Lance camper,[2] both of which he acquired in December 2000. Noster

---

[1] The record refers to the off-road vehicles variously as motorcycles and/or ATVs. We refer to them herein as "ATVs."

[2] The camper attached directly to the bed of the truck.

obtained the truck from Thorson GMC in Pasadena after making an initial down payment and financing the rest through GMAC. On the credit application, Noster falsely indicated that he was employed.[3] Noster similarly misrepresented his employment status on his application to finance his purchase of the camper through Bank of the West. When Noster stopped making payments on both in October 2001, he owed around $31,935 on the truck and $22,071 on the camper.

By the time Beene was assigned to investigate Noster's case in October 2002, neither GMAC nor Bank of the West had been able to locate Noster in their respective efforts to repossess the truck and camper. Beene learned of GMAC's repossession efforts by speaking with Dave Mundy from GMAC on October 9, 2002. Beene also spoke with the owner of Thorson GMC Pasadena, Tom George ("George"), who told Beene that he would not have sold Noster the truck if he had known that Noster was unemployed. Following this conversation, George signed a "CHP 180/Stolen Vehicle Report," which Beene entered into a statewide stolen vehicle database.[4]

The same day that Beene spoke with George, Beene interviewed a Bank of the West representative, who advised him of the bank's unsuccessful attempts to locate Noster and repossess the camper. Beene also interviewed two of the three

---

[3]Noster listed his "current" employer as Easton, Inc., even though he had not been employed by that company for over a month — a fact which Beene confirmed in his investigation.

[4]The CHP 180/stolen vehicle report states as follows (capitalization altered): "Vehicle purchased by suspect Noster from dealership by fraudulent means—false info. on credit application. $31,935 outstanding balance due to suspect failing to make required monthly payments. Veh. entered into sys. by Sec. Martinez." In district court, Noster filed a declaration by George stating that he "did not fill out a stolen vehicle report related to John Noster or his truck." However, Noster indicated during the suppression hearing that he would not contest the validity or authenticity of George's signature on the stolen vehicle report, and has challenged neither on appeal.

dealers from whom Noster stole ATVs in 2001. One of those dealers, Bill McLean ("McLean"), told Beene that Noster had written a check for a down payment on two ATVs, and then wrote a check for the balance, which bounced. Beene shared with McLean information about Noster's other thefts, including details regarding how Noster had absconded with the truck and camper.[5]

## B.    The Searches

On November 11, 2002, while Beene was on vacation, McLean drove by Noster's father's home and spotted a truck and camper parked nearby matching the descriptions given to him by Beene. McLean notified the police, and Officers Murphy and Capa of the Los Angeles Police Department responded to the call. When the officers arrived on the scene, McLean told them that he believed the truck and camper were stolen, that Noster was the suspect, and that a warrant had been issued for Noster's arrest. McLean produced paperwork describing the truck and its license plate number. The officers ran the number through the stolen vehicle database, which indicated that the truck had been reported stolen. Because the truck was missing its license plate, the officers also ran the truck's VIN number, which confirmed the report. The officers called their watch commander, who ordered them to impound the truck.

In preparing to impound the truck, Officer Murphy discovered a backpack on the rear driver side floor containing what appeared to be an explosive device. They ceased their search, evacuated the area and contacted the Los Angeles Police Department bomb squad. Marquez and other TRAP officers also arrived on the scene, and Marquez entered the locked camper, purportedly to clear it of persons or possible explo-

---

[5]Beene apparently also shared with McLean a description of the truck and its license plate number, as well as the address of Noster's father's home, which was the address Noster had given on his credit applications.

sive devices. After the incendiary device was rendered safe, the truck was impounded, and later taken to a private tow yard (Ken's Tow).

At some point prior to the impoundment, the officers learned from McLean that Noster's father's house was nearby. As they approached the house, Noster emerged and identified himself. The officers detained Noster for possession of an explosive device, and took him into custody after discovering the warrant for his arrest.

Following Noster's arrest and the impoundment of the truck, Marquez prepared a search warrant for Noster's father's home, which was executed on November 12, 2002. He recovered, among other things, a set of keys to the impounded truck, and proceeded to Ken's Tow where he tested the keys and found several documents and a Toshiba laptop inside the truck. Marquez left the items in place, which was secured in an enclosed building at the tow yard, and waited for Beene's return to complete the search.

Beene returned to work on November 18, 2002, and on November 19, he and Marquez searched the truck and camper.[6] Documents recovered from the camper included receipts from a storage facility in Noster's name. The officers contacted the facility's manager, who confirmed that Noster rented a unit there. They obtained a search warrant for the storage unit, which was executed on November 21, 2002.

In executing the warrant, the officers found a number of items including, but not limited to: (1) three pipe bombs, (2)

---

[6]During the search, Beene pried open a padlocked storage container on top of the camper, which revealed a plastic bag containing the same type of incendiary device discovered in the truck's cab during the initial search. Beene and Marquez evacuated the area and contacted the bomb squad. Noster was not ultimately charged with possession of this incendiary device, and did not challenge its discovery in his suppression motion.

six 55-gallon drums, which the manager believed were filled with gasoline, (3) seven assault rifle magazines (one of which was loaded with 20 bullets), (4) what appeared to be a rifle silencer or barrel extender, (5) a rifle drum, (6) another smaller rifle magazine, and (7) a yellow paper tablet containing what appeared to be plans for using a gyrocopter[7] or ATV to bomb large structures.[8]

## C. Procedural Background

Noster was convicted and sentenced in state court in connection with his theft of the ATVs. In May 2004, near the end of Noster's term in state prison, a federal grand jury indicted him on two counts of possessing unregistered firearms in violation of 26 U.S.C. § 5861(d). The first count charged him with possession of the incendiary device found in the truck on November 11, 2002 (just prior to the impoundment), and the second count charged him with possession of the pipe bombs discovered at the storage facility on November 21, 2002.

On October 18, 2004, Noster filed a motion to suppress both the incendiary device and the pipe bombs. In denying Noster's motion, the district court held that Noster could not challenge the searches because he did not have a legitimate expectation of privacy in the truck or camper due, in part, to his failure to make payments on either for over a year. Further, the district court held that even if Noster could challenge

---

[7]A "gyrocopter" is "a small, light single-seater autogiro," similar to a helicopter. *The New Oxford American Dictionary* 761 (2001).

[8]Noster's handwritten notes read as follows:

> Gyro choppers, quad runner, develop incendiaries that ignite with a delay of at least five seconds. If you want to destroy structure there are two options (1) to drop a gyro. This would limit the size of the instrument. Not over twenty pounds. But would cause the most action for its weight. (2) [*sic*] to place the instrument close to the object in question. This would require a much larger instrument because it disperses over a much larger area. You would have to get close to the object without detection.

the searches, the evidence was obtained lawfully. Specifically, it held that the incendiary device was obtained during a lawful inventory search, and that discovery of this device provided probable cause to search the entire truck and camper.

On February 1, 2005, Noster pled guilty to both counts and was sentenced to sixty-one months in prison. The sentence reflected a four-level enhancement under § 2K2.1(b)(6) of the Guidelines for Noster's intent to use of the incendiary device in connection with a specifically contemplated felony, i.e., "economic terrorism."[9]

## II.

Noster appeals the district court's denial of his motion to suppress and its application of § 2K2.1(b)(6) of the Guidelines. We affirm on both issues.

### A.   Exclusion Is Not Warranted

#### 1.   *Exclusionary Rule*

[1] "The exclusionary rule operates as a judicially created remedy designed to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect." *Ariz. v. Evans*, 514 U.S. 1, 10 (1995) (citing *United States v. Leon*, 468 U.S. 897, 906 (1984)). "The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Evans*, 514 U.S. at 10 (quoting *Illinois v. Gates*, 462 U.S. 213, 223 (1983)).

---

[9]As explained below, the government produced evidence that Noster intended to recover a monetary profit in connection with the contemplated effects of bombing various companies or commodities.

"The exclusion of evidence 'has always been our last resort, not our first impulse,' " *Lopez-Rodriguez v. Holder*, 560 F.3d 1098, 1103 (9th Cir. 2009) (quoting *Herring v. United States*, 129 S. Ct. 695, 700 (2009)), and even an actual violation of one's Fourth Amendment rights "does not necessarily mean that the exclusionary rule applies." *Herring*, 129 S. Ct. at 700.

In *Herring*, the Supreme Court expounded on the purpose and application of the exclusionary rule when it affirmed the denial of a motion to suppress based on facts similar to those presented here. Herring was stopped by police officers who were informed by a dispatcher that a database revealed an outstanding warrant for Herring's arrest. Just minutes after the arrest, however, the warrant clerk notified the officers that the warrant had actually been recalled and remained in the database due to a system error. By the time the officers were notified, they had uncovered methamphetamine and a firearm.

[2] The Court affirmed the denial of the motion to suppress this evidence, holding that "when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, the marginal deterrence [of applying the exclusionary rule] does not 'pay its way' [i.e., outweigh the social costs of letting the guilty go]." *Herring*, 129 S. Ct. at 704. The Court explained that the critical inquiry for determining whether the exclusionary rule should apply is whether the

> police conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless or grossly negligent conduct . . . .

*Id.* at 702-03.

**[3]** Here, Noster's entire motion to suppress is based on Beene's allegedly improper entry of the stolen vehicle report into the database. We assume without deciding that Noster had a legitimate expectation of privacy in the truck and camper, and therefore standing to challenge the search. But we conclude that even if Beene made an error of state law by reporting Noster's GMC Sierra truck as a stolen vehicle and entering a stolen vehicle report (which was signed by George) into the stolen vehicle database, such an error did not violate Noster's Fourth Amendment rights because Beene had probable cause to believe that the truck was evidence of a crime. In any event, the state-law error "was not so objectively culpable as to require exclusion" under *Herring. Id.* at 703.

## 2. *November 11, 2002 Search*

First, we address Noster's motion to suppress the incendiary bomb discovered in the truck on November 11, 2002. Noster contends that the seizure of and subsequent search of the truck by Officers Capa and Murphy was unconstitutional because it was based on Beene's "false" report that the truck was stolen.

This scenario is akin to the facts of *United States v. Hensley*, 469 U.S. 221, 233 (1985). In *Hensley*, a police officer in another jurisdiction issued a "wanted flyer" to other police departments indicating that the defendant was wanted in connection with a robbery investigation. *Id.* at 223. Police officers from another jurisdiction stopped the defendant's vehicle and uncovered evidence leading to his prosecution on other charges. *See id.* at 223-25. Without reaching the issue of whether the evidence should be excluded, the Court determined that there was no Fourth Amendment violation, because the officers who made the stop acted in reasonable reliance on a flyer issued by officers who had reasonable suspicion to justify the stop. *Id.* at 232-33; *Evans*, 514 U.S. at 12 (noting that the conclusion in *Hensley* that the evidence was admissible rested on the determination that there was no

Fourth Amendment violation, and that this did not contradict the Court's earlier pronouncements that the question whether the exclusionary rule applies is an issue separate from the question whether the Fourth Amendment rights were violated).

[4] Like the arresting officers in *Hensley*, there is no dispute that Officers Capa and Murphy acted in reasonable reliance on the stolen vehicle database to conclude that the car was stolen and thus "seizable" pursuant to California law. *See* Cal. Veh. Code § 22651(c) (providing that an officer may remove a vehicle from a public street where "a report has previously been made that the vehicle has been stolen"). Moreover, because we impute Officer Beene's probable cause to believe that the vehicle was evidence of criminal fraud to the two officers, *see Hensley*, 469 U.S. at 233, their seizure and search of the truck was also reasonable under the Fourth Amendment. *See Maryland v. Buie*, 494 U.S. 325, 330 (1990) (noting that a police officer could lawfully seize evidence "which was in plain view and which the officer had probable cause to believe was evidence of a crime"); *United States v. Bagley*, 772 F.2d 482, 491 (9th Cir. 1985) ("[I]f the existence of probable cause alone justifies the warrantless search of a vehicle parked in a public place, certainly a warrantless seizure of such a vehicle, based only on probable cause, also falls within the automobile exception."); *United States v. Cooper*, 949 F.2d 737, 747 (5th Cir. 1991) (holding that "the police may seize a car from a public place without a warrant when they have probable cause to believe that the car itself is an instrument or evidence of crime"); *cf. Florida v. White*, 526 U.S. 559, 565 (1999) (holding the warrantless seizure of a vehicle reasonable under the Fourth Amendment when police officers "had probable cause to believe that the vehicle itself was contraband under Florida law" (emphasis omitted)). The officers also reasonably relied on the report to conduct a warrantless search of the truck prior to impounding it. *See Colorado v. Bertine*, 479 U.S. 367, 369 (1987) (affirming inventory search of a vehicle prior to impoundment); *South*

*Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (holding that officers may conduct an inventory search of a lawfully impounded vehicle without a warrant).

**[5]** The circumstances surrounding the entry of the report into the system do not undermine Beene or the officers' probable cause or the officers' otherwise lawful search and seizure. Contrary to the dissent's suggestion, there is no evidence that Beene fabricated the report in order to effect Noster's arrest or seizure of the truck — conduct which might well justify exclusion. Rather, the record shows that the report was the product of an investigation that led Beene to conclude, reasonably, that Noster had obtained the truck through fraud akin to the fraud used to procure the ATVs.

**[6]** Indeed, the record shows that Beene did not sua sponte enter the report into the database. Rather, he had the report registered into the system after interviewing George, Mundy, and Noster's former employer, and after George — not Beene — signed it. Although California law does not explicitly authorize a dealer like George to report a vehicle stolen under these circumstances, it appears that GMAC may have done so as the "legal owner" of the truck.[10] The fact that George,

---

[10]The California Vehicle Code authorizes both the legal owner of a vehicle and police officers to report a vehicle stolen. *See* Cal. Veh. Code § 10502 (providing that the legal owner of a vehicle may report a vehicle as being stolen); Cal. Veh. Code § 10500(a) (providing that a peace officer who receives a report based on reliable information that a vehicle has been stolen in violation of California Vehicle Code § 10851 must report such information to the Department of Justice Stolen Vehicle System). California law recognizes GMAC as the "legal owner" of the truck. *See* Cal. Veh. Code § 370 (defining "legal owner" as a person holding a security interest in a vehicle which is subject to the provisions of the Uniform Commercial Code); *but see* Cal. Veh. Code § 17156 (providing that where a motor vehicle is sold "under a contract of conditional sale, whereby the title to such motor vehicle remains in the vendor," the vendee shall be deemed the owner until the vendor or his assignee retake possession of the motor vehicle). It is unclear how sections 370 and 17156 coalesce in circumstances

rather than GMAC, signed the report does not demonstrate bad faith on Beene's part.[11] Rather, the record shows that Beene's investigation uncovered reliable information regarding Noster's fraud and wrongful retention of the truck. Although Noster's actions do not neatly fit the elements of vehicle theft under California Vehicle Code § 10851,[12] the law defines theft generally to include theft by false pretenses. *See* Cal. Penal Code § 484 (defining theft to include embezzlement, theft by trick and device, and theft by false pretenses). Theft by false pretenses requires (1) criminal intent to defraud the owner of his property, (2) a false representation that materially influenced the owner to part with his property, and (3) that the owner was in fact defrauded. *People v. Ashley*, 267 P.2d 271, 279 (Cal. 1954).

Here, after talking to representatives of both GMAC and the dealership, Beene believed that Noster had acquired the truck through such criminal fraud. While the first element — Noster's intent to defraud — is not conclusively established

like those presented here, but at least one California case suggests that the financing company is the legal owner. *See Jerman v. Super. Ct.*, 54 Cal. Rptr. 374, 376 (Ct. App. 1966) (holding that the financing company was the legal owner of a vehicle where the buyer had defaulted under the conditional sales contract).

[11]Noster points out that the database entry identified Beene as the "victim" to be contacted, and argues that this is evidence of Beene's bad faith. However, the actual stolen vehicle report does not list Beene as the victim, and there is no evidence indicating that Beene's listing himself as a point of contact in the system was improper.

[12]A person violates § 10851 by "driving or taking of a vehicle belonging to another person, without the owner's consent, and with specific intent to permanently or temporarily deprive the owner of title or possession." *People v. Green*, 40 Cal. Rptr. 2d 239, 247 (Ct. App. 1995). The record demonstrates Noster's intent to deprive GMAC of its ownership interest in the truck, but Noster's conduct does not neatly fit the elements of this crime, since his initial acquisition of the vehicle was "with the owner's consent" via a standard credit arrangement (albeit one tainted by his false representations).

given his initial payments on the truck, it might reasonably be inferred from his false statements on the credit application. Noster's false representation as to his employment status also supports the second element. Further, the purchase contract provided that the seller relied on Noster's statements, and George later confirmed to Beene that he would not have sold Noster the truck had he known that Noster was unemployed. However, determining whether Noster "stole" the truck through fraud is complicated by the fact that GMAC, not George, was the "legal owner" of the truck at the time of Beene's investigation, and by a lack of evidence as to whether GMAC would have extended credit to Noster had he disclosed his true employment status.

[7] Although Noster may not have ultimately been proven guilty of "theft by false pretenses," that is not the standard for determining whether Beene had probable cause to believe that the truck was stolen or purchased by fraudulent means (or whether he acted in such disregard to Noster's constitutional rights in so reporting it that exclusion is warranted). We do not require that the facts known to Beene establish Noster's guilt beyond a reasonable doubt. *United States v. Corral-Villavicencio*, 753 F.2d 785, 788 (9th Cir. 1985). Moreover, even if Officer Beene erred in determining that the purchase of a truck by fraudulent means was equivalent to the truck being "stolen" as a matter of California law, such a state-law error would not be dispositive. In *Virginia v. Moore*, the Supreme Court explained that a police officer does not violate "the Fourth Amendment by making an arrest based on probable cause but prohibited by state law." 128 S. Ct. 1598, 1601, 1607 (2008). The Court explained that "an arrest based on probable cause" is reasonable under the Fourth Amendment even when the arrest was illegal as a matter of state law. *Id.* at 1605; *see also United States v. Brobst*, 558 F.3d 982, 990 (9th Cir. 2009) (applying the Court's holding in *Moore* to seizures of property). In other words, officers who have sufficient probable cause or reasonable suspicion for a search, seizure or arrest for purposes of the Fourth Amendment do

not violate a defendant's constitutional rights even if the officers' actions violate state laws. Applying *Moore* and *Brobst* to this case, the question here is whether the report, upon which Officers Capa and Murphy later reasonably relied, was itself based on probable cause to believe that the truck was seizable evidence of a crime, *see Cooper*, 949 F.2d at 747, not whether filing a stolen vehicle report was erroneous as a matter of California law.

"Probable cause exists 'when police officers have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.'" *United States v. Wallace*, 213 F.3d 1216, 1220 (9th Cir. 2000) (quoting *United States v. Fouche*, 776 F.2d 1398, 1403 (9th Cir. 1985)).

[8] Here, Beene's belief that Noster had used fraudulent means to procure the truck was reasonable based on his investigation. Beene explained that Noster's theft of the ATVs from various dealerships through fraudulent means (i.e., Noster's withdrawal of money from his bank account shortly after writing checks to pay for the ATVs), together with the fraudulent statements on the credit applications for the truck and camper, led him to believe that Noster had committed a fraud in obtaining the truck. Beene's perspective was further supported by his interview of Mundy from GMAC, who confirmed that Noster had not made a payment on the truck for over a year and had evaded GMAC's repossession efforts, and George, who said that he would not have sold Noster the truck if he had known that Noster was unemployed.

[9] Although these facts may not ultimately prove Noster's theft of the truck by false pretenses, they are more than sufficient to support Beene's reasonable belief that Noster's acquisition and continued possession of the truck was unlawful. *See Wallace*, 213 F.3d at 1220 (noting that officer "was not taking the bar exam" when he stopped a vehicle based on his mistaken belief regarding which section of the vehicle code

defendant's tinted windows violated). Such a reasonable
belief fails to establish either a violation of Noster's constitu-
tional rights or the necessary culpability to justify exclusion.
Accordingly, we conclude that Beene had probable cause to
believe that the truck was seizable as evidence of a crime and
affirm the district court's denial of Noster's suppression
motion with respect to the incendiary device discovered dur-
ing the search on November 11, 2002.

### 3.  *November 19, 2002 Search*

Noster also appeals the district court's denial of his motion
to suppress the pipe bombs discovered in his rented storage
unit on November 21, 2002. The search warrant for that facil-
ity was based on evidence uncovered during a search of the
truck and camper on November 19. Noster challenges the
November 19 search of the camper based on (1) the alleged
unlawfulness of Beene's initial stolen vehicle report, (2) the
officers' failure to comply with Los Angeles Police Depart-
ment inventory procedures, and (3) the officers' delay in com-
pleting the search and their failure to obtain a warrant.

We have already rejected Noster's challenge to the stolen
vehicle report, and his other arguments are not persuasive.
The record shows that Beene and Marquez were "processing"
the truck/camper for evidence, and not simply taking an
inventory of the contents.[13] Although the officers likely could
have obtained a warrant for this search, the Supreme Court

---

[13]Even if the search was purely for inventory purposes and thus required
to comply with official inventory procedures, *see United States v. John-
son*, 936 F.2d 1082, 1084 (9th Cir. 1991) (citations omitted), the record
is unclear regarding which official policies would govern. Noster cites the
Los Angeles Police Department's procedures, and the officers' alleged
failure to comply with them by failing to list in the "remarks" section all
of the items seized from the truck and camper. However, it is unclear
whether the Los Angeles Police Department procedures would apply,
since Beene worked for the Pasadena Police Department in connection
with the TRAP.

has explained that "[t]he relevant test *is not the reasonable-
ness of the opportunity to procure a warrant*, but the reason-
ableness of the [search] under all the circumstances."
*Opperman*, 428 U.S. at 373 (citations and internal quotation
marks omitted) (emphasis in original); *see also Cooper v.
California*, 386 U.S. 58, 62 (1967).

[10] We conclude that the search on November 19, 2002,
was supported by probable cause and was reasonable under
the circumstances. The police had properly seized the truck in
connection with the report that it was stolen, and Noster does
not argue that their continued retention of it was in any way
improper. Furthermore, the initial inventory search on
November 11 uncovered evidence of additional criminal
activity, namely, the incendiary device. *See* Cal. Pen. Code
§ 453 (prohibiting possession or manufacture of an incendiary
device with intent to willfully use it to set fire to or burn any
structure, forest land, or property). The discovery of this
device provided probable cause to search the truck and
camper for additional evidence of criminal activity. *See Coo-
per*, 386 U.S. at 61-62 (upholding a warantless search of an
impounded vehicle where search related to events surround-
ing the arrest).

[11] Nor did the officers' delay in completing the search of
the truck and camper diminish the probable cause or render
the search otherwise unreasonable. Indeed, the "justification
to conduct a warrantless search does not vanish once the car
has been immobilized," and "[t]here is no requirement that the
warrantless search of a vehicle occur contemporaneously with
its lawful seizure." *United States v. Johns*, 469 U.S. 478, 484
(1985) (upholding the search of packages seized from a truck
three days after the initial seizure) (citations and internal quo-
tation marks omitted); *United States v. Albers*, 136 F.3d 670,
674 (9th Cir. 1998) (holding that where there is probable
cause to support the search, the search need not occur imme-
diately upon seizure but the delay must be reasonable). Here,
the truck was being retained, in part, in connection with

TRAP's investigation of Noster's vehicle thefts. Accordingly, it was reasonable to await Beene's return to complete the search, as he was the lead detective on the case.

## B. No Abuse of Discretion in Sentencing

Noster challenges the district court's application of § 2K2.1(b)(6) of the Guidelines to enhance his sentence, contending that there was insufficient evidence to show that he had a "firm intent" to use the incendiary devices in connection with another felony. We review the district court's application of the Guidelines to the facts for abuse of discretion. *United States v. Kimbrew*, 406 F.3d 1149, 1151 (9th Cir. 2005).

[12] A defendant is subject to a four-level sentencing enhancement under § 2K2.1(b)(6) if he "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense."[14] United States Sentencing Guidelines Manual § 2K2.1(b)(6) (2006). "A 'felony offense' is 'any offense (federal, state, or local) punishable by imprisonment for a term exceeding one year, whether or not a criminal charge was brought, or conviction obtained.' " *United States v. Jimison*, 493 F.3d 1148, 1149 (9th Cir. 2007) (quoting former United States Sentencing Guidelines Manual § 2K2.1 cmt. n.4). The government bears the burden of producing sufficient evidence that the defendant intended to use or possessed the firearm in connection with a specifically contemplated felony. As we explained in *Jimison*,

[t]he plan to commit the felony need not be fully

---

[14]Under the Guidelines, "firearm" is defined to include "any weapon . . . which . . . is designed to or may readily be converted to expel a projectile by the action of an explosive," or "any destructive device." United States Sentencing Guidelines Manual § 1B1.1(G) (2006).

developed. Thus if a defendant acquires a gun
intending to use it in a bank robbery, he need not
have cased the location or even identified a specific
bank that he plans to rob. But he must have formed
a firm intent to use the gun for a felonious purpose.

493 F.3d at 1149.

[13] Here, the government asserted that Noster planned to
use the incendiary devices to bomb companies or commodi-
ties in a scheme to make money. Specifically, it cited evi-
dence suggesting that Noster believed that bombing specific
companies would drive down the price of stock and allow him
to make a profit by short selling the stock, and that bombing
certain commodities would increase their price, thereby
allowing him to cash in on previously purchased futures.[15]
The relevant evidence included a list of various commodities
and companies, commodities trading websites, shopping
malls, and "stocks" of specific companies with notes to
research the companies' weaknesses.[16] Another document
detailed Noster's "plan" to destroy a structure by either drop-
ping incendiaries from a gyrocopter or by using an ATV to
approach the structure undetected with larger incendiaries.
The investigation uncovered the stolen ATVs, around
$180,000 in cash, and numerous books and publications con-
taining instructions for making homemade explosives. Noster
had the ingredients to make an incendiary device described in
one of these books, as well as two such completed devices.

---

[15]Such a plan, whether attempted or completed, would constitute a "fel-
ony" for purposes of § 2K2.1(b)(6). See e.g., 18 U.S.C. § 844(i) (providing
a five-year minimum sentence for the destruction or attempted destruction
of any building used in interstate commerce by means of an explosive
device ); Cal. Pen. Code §§ 451 and 455 (providing that arson and
attempted arson are felonies).

[16]The record also shows that Noster was fairly sophisticated financially.
He had a degree in accounting and experience with buying and selling
stocks and commodities, and admitted to discussing the impacts of terror-
ism on investments with an instructor from a class he took in 1994.

He also had extensive information about purchasing a gyro-copter, including price lists, classified advertisements, nota-tions about various models, and information regarding gyrocopter flight school. In assessing all this evidence, the district court noted that while Noster's fraud crimes appeared to be unrelated to the contemplated felony, they nonetheless demonstrated "the mind-set of someone who is bold enough to act out [such] a plan." Although Noster's scheme may not have been well-developed, we conclude that the record con-tains sufficient evidence to support the district court's finding that Noster had the "firm intent" and ability to use the incen-diary devices in this way. Accordingly, we conclude that the district court's imposition of the four-level enhancement pur-suant to § 2K2.1(b)(6) was not an abuse of discretion.

## III.

In sum, we affirm the district court's denial of Noster's motion to suppress, as the circumstances surrounding the search of the truck do not warrant exclusion. We also con-clude that the district court did not abuse its discretion in enhancing Noster's sentence pursuant to § 2K2.1(b)(6).

## AFFIRMED.

SHADUR, Senior District Judge, dissenting:

When this case was submitted to our panel, we were well aware that just over two weeks earlier—on the second day of the Supreme Court's October 2008 Term—the Court had heard oral argument in *Herring v. United States*. Because it seemed likely that the Fourth Amendment issue as posed in *Herring* might cast light on the issue in this case, we elected to hold off our opinion here until we learned of the Supreme Court's resolution in *Herring*.

That decision came down in mid-January, and although *Herring* produced a five-to-four split in the Court, that division has proved remarkable in terms of our case. *Both* the five-Justice majority and the four-Justice minority, I believe, have stated principles that call for reversal here. Let me explain why.

Vigilantism—whether manifested by group action such as that of a lynch mob or by individual rogue activity—is the enemy of orderly law enforcement. It is infinitely worse when practiced by a law enforcement officer such as Detective Beene, for such officers are cloaked with authority that can too readily turn the wheels of justice into wheels of constitutional injustice.

Yet Beene, no doubt prompted by defendant Noster's unsavory past, seized on his delinquency in payments on the 2001 GMC Sierra truck to distort that delinquency into a nonexistent "theft" of the truck. Never mind that Noster had not only made the initial down payment but had regularly made the first seven monthly payments on the vehicle before he went delinquent. Never mind that GMAC Financial Services, which had financed the transaction and was thus the creditor directly interested in getting repaid for the credit that it had extended (and having ample resources at its command), had taken no steps to label Noster a thief. Instead its efforts had been devoted exclusively to seeking an orderly repossession of the truck, just as it would with any other buyer in default on his payments. Noster was a delinquent purchaser, yes—but a thief? Decidedly not.

To be sure, the majority is correct in observing that Beene —like the officer in the *Wallace* case—"was not taking the bar exam" when he then performed his sleight of hand, somehow converting Noster's assertedly "unlawful" (the majority's word) retention of the vehicle when he went delinquent *after having made the first seven payments* into a purported "theft" of that vehicle. But having said that, the majority has itself

had to strain in an effort to place Noster's post-delinquency retention of the vehicle under a "theft by false pretenses" rubric (what "false pretenses" were made by Noster, pray tell, when he bought the vehicle and thereafter proceeded to make a substantial series of the required installment payments?).

Essentially the majority seeks to transmute base metal into gold by transforming Detective Beene's unequivocal statement that the vehicle was *stolen* into some notion of "criminal fraud" or the like. With all due respect, I believe that such revisionist history regrettably whitewashes Beene's own unlawful conduct, effectively creating a kind of asserted "probable cause" when in fact Beene was totally lacking in probable cause to label the vehicle as "stolen."

In any case, Beene did indeed go about creating a scenario to convert Noster's payment delinquency—a civil matter—into a purported theft. To that end Beene first went to Thorson GMAC Pasadena owner-president Tom George ("George"), and he said in his later report that George signed a CHP 180/Stolen Vehicle Report. That version of events is certainly questionable, for George later filed this declaration with the district court:

> I would not fill out nor sign a stolen vehicle report in any case where a buyer failed to make payments (to the finance company) on a car that was purchased through Thorson GMC. Nor would I call the police regarding a situation where the buyer failed to make such payments. I would not have the authority to report a vehicle stolen in that circumstance because the dealership would not be considered the owner of the vehicle. I did not call the police to report that Mr. Noster stole his truck and I did not fill out a stolen vehicle report relating to Mr. Noster or his truck. However, I do know Detective Beene because he has been at my dealership related to vehicles that have been stolen off the lot.

But whoever signed the report in fact, there is no question that Beene at least instigated the "stolen" characterization. In any event, Beene then spoke with Bill McLean ("McLean"), who had sold two motorcycles to Noster the year before only to find that the check for final payment of the purchase price (which McLean had verified through Noster's bank as supported by sufficient funds) turned out later to be returned for insufficient funds.

It was then McLean who later spotted the GMC Sierra truck with a Lance Camper and reported it to the police. With Beene away on vacation, other officers responded to McLean's call and were told that the information he had obtained from Beene was that the truck and camper were stolen. That was confirmed by the officers by tracking down the stolen-truck report, and they then obtained orders to impound the truck and undertook the search at issue in this case.

That is the backdrop against which the decision in *Herring* may appropriately be viewed. Speaking for the five-Justice majority there, Chief Justice Roberts rejected a bright-line rule in which one law enforcement officer's good faith reliance on another officer's unconstitutional misdeed would automatically be constitutionally tainted as well. Instead the majority opinion summarized its holding in these terms (127 S.Ct. 695, 702 (2009)):

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

Just a bit later the majority opinion went on to say (*id.* at 703):

> If the police have been shown . . . to have knowingly
> made false entries to lay the groundwork for future
> false arrests, exclusion would certainly be justified
> under our cases should such misconduct cause a
> Fourth Amendment violation.

Those holdings aptly describe Detective Beene's miscon-
duct. Surely his actions were both deliberate and culpable and
caused a knowingly false entry, so that I submit adherence to
the *Herring* majority rule plainly calls for reversal here. And
as for *Herring*'s four-Justice minority, it urged the retention
of a bright-line standard under which reliance by non-culpable
law enforcement personnel on errors (even negligent errors)
made by other law enforcement people would trigger the
operation of the exclusionary rule. That stance of course also
calls for reversal here, this time on an a fortiori basis.

In sum, I believe that the *Herring* opinions, fairly read, call
unanimously for reversal. By contrast, the majority in this
case—fully aware (as I am too) that Noster is a very bad man
indeed—has opted to ignore Beene's obvious belief that when
it comes to dealing with someone he views as among the
dregs of society, the ends somehow justify illegal means. We
are entitled to expect—and to get—better than that from the
personnel to whom we entrust the powers of law enforcement,
not of law breaking. Accordingly I respectfully dissent.